IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JONATHAN NASH and NORTH O RISING, LLC,<br><br>                Plaintiffs,<br><br>      v.<br><br>NEBRASKA DEPARTMENT OF ECONOMIC DEVELOPMENT, and K.C. BELITZ, RYAN ZIMMERMAS, LYDIA LASSEN, DEISY COYLE, ABRA KATAKA, and ASSETINA KATAKA, in their official capacities,<br><br>                Defendants. | 4:24CV3103<br><br>MEMORANDUM AND ORDER |

      In this case (Filing No. 1-1), plaintiffs Jonathan Nash ("Nash") and North O Rising, LLC ("North O Rising" and collectively, the "plaintiffs") challenge the denial of their application for an economic development grant. The plaintiffs allege defendants Nebraska Department of Economic Development (the "department"), K.C. Belitz, Ryan ZimmerMas ("ZimmerMas"), Lydia Lassen ("Lassen"), Deisy Coyle, Abra Kataka, and Assentina Kataka's (together, the "defendants") decisions to distribute grants under the North and South Omaha Recovery Grant Program (the "grant program") have been made unlawfully and discriminatorily. They seek monetary, injunctive, and declaratory relief.

      Now before the Court is the defendants' Motion to Dismiss (Filing No. 2) pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6). The defendants lodge a number of attacks at the plaintiffs' claims—some warranted, others not. After thorough consideration of the parties' arguments, the Court finds dismissal is warranted on some of the plaintiffs' theories for relief.

I.  **BACKGROUND**[1]

Nash, an African-American man, is a native of the North Omaha area of Omaha, Nebraska.  As a child, Nash attended public schools in North Omaha and was active in the surrounding community.  After graduating from the University of Pennsylvania Law School and working as a teaching assistant at the university's Wharton School of Business, Nash returned to Omaha with his eyes set on giving back to his North Omaha community.

For over twenty-five years, Nash has been licensed as a real estate broker in Nebraska and has been the principal of a real estate development and property management firm.  Overall, Nash has been involved in over one-hundred real estate projects.  He has also served as a board member of both Housing in Omaha, the Omaha Housing Authority's real estate development enterprise, and the City of Omaha Zoning Board of Appeals.

In April 2022, the Nebraska legislature enacted the Economic Recovery Act ("ERA"), *see* Neb. Rev. Stat. § 81-12,238 *et seq*., to provide for economic development spending in areas especially impacted by the COVID-19 pandemic.  The ERA was to provide at least $335 million to those communities, including tens of millions to North Omaha, through funds primarily made available by the federal American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 (2021).  The North 24th Street area of North Omaha, specifically, was set to receive around $54 million under the ERA.

---

[1] At this stage, the Court "accept[s] the allegations contained in the complaint as true and make[s] all reasonable inferences in favor of the nonmoving party." *Ringhofer v. Mayo Clinic, Ambulance*, 102 F.4th 894, 901 (8th Cir. 2024) (quoting *Martin v. Iowa*, 752 F.3d 725, 727 (8th Cir. 2014)); *see also Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 195 (2024) ("At this stage, though, the Court must assume the well-pleaded factual allegations in the complaint are true.").

Olsson, a private contractor, was appointed to independently and objectively review ERA grant applications. The review process was set up to be triple-blind and evaluate each application based on its alignment with the ERA's goals.

Since 1999, Nash has owned the property at 1702 North 24th Street (the "North 24th Street property"), a location within the targeted North 24th Street area and at the heart of the North Omaha Business Improvement District. In 2022, Nash formed North O Rising—a 100% minority-owned company—to own the property and pursue grants for its refurbishment. The plaintiffs applied for a $700,000 grant under the ERA on October 7, 2022, in order to renovate the North 24th Street property as a mixed-use building (the "North 24th Street project"). The plaintiffs expect the North 24th Street project to create temporary jobs for tradespeople and have already secured a long-term lease commitment from a small technology company. That business, they hope, will bring high-paying jobs, development, and economic growth to the area.

In January 2023, Olsson recommended funding the plaintiffs' North 24th Street project under the ERA. This first application process was voided, however, following public outcry over potential conflicts of interest and favoritism in the grant application and review process. In response, the Nebraska legislature enacted the grant program in June 2023. *See* Neb. Rev. Stat. § 81-12,241.01. Like the ERA, the grant program was created "to respond to the negative impact of the COVID-19 public health emergency and build resilient and innovative communities" while prioritizing "small business development, job creation, and economic development." *Id.*

In Fall 2023, Omaha Mayor Jean Stothert ("Mayor Stothert") reached out to Lassen, an Economic Recovery Program Manager at the department, to express her support for the plaintiffs' North 24th Street project. In her letter, Mayor Stothert described her view that their "application for a North and South Recovery Grant . . . align[ed] with [multiple] City of Omaha priorities." Overall, she "support[ed] the

planned redevelopment of" the North 24th Street property as part of a promising strategy to revitalize the surrounding area.

Around that time, Nash also spoke with ZimmerMas, the department's then-Lead Economic Recovery Program Manager. Nash explained the plaintiffs had submitted multiple projects as part of one grant application and worried that each project would not receive an individual evaluation as a result. According to Nash, ZimmerMas quelled any of those worries and assured him the submitted projects would be scored separately and independently from each other.

Finally, on January 31, 2024, the department named the proposed recipients for the grant program awards. None of the plaintiffs' projects were selected. This included the North 24th Street project, which had been recommended for approval by both Olsson and Mayor Stothert. The plaintiffs believe the proposed grants "are unfair, discriminatory, arbitrary, and capricious."

The plaintiffs weren't the only ones disappointed. The ERA's legislative co-sponsors expressed their dismay that the "historic investment . . . fell short of the transformative promise envisioned by the Legislature." They particularly faulted the program for awarding the overwhelming majority of funds to "nonprofits with little to no economic development and [some that] are already supported by millionaires."

The plaintiffs further emphasize that the bulk of the awarded projects do not satisfy the legislation's goals and fall outside of the targeted geographic areas. They also complain that some of the proposed recipients did not exist before the COVID-19 pandemic. Additionally, most of the selected projects did not receive an initial recommendation from Olsson. The plaintiffs allege that, except for their North 24th Street project, every other applicant who received an initial Olsson recommendation was selected for funding.

Nash participated in a phone conference with some of the defendants on February 23, 2024. They did not explain their reasoning for denying the plaintiffs' application for funding for the North 24th Street project. They informed Nash there would be no process for appealing the determination. According to Nash, the conversation also revealed the North 24th Street project was not independently reviewed or evaluated despite ZimmerMas's assurances.

The plaintiffs initially sued the department in this Court on March 21, 2024 (Filing No. 1 in Case No. 8:24CV105). They alleged the department's selection of grant program recipients violated the plaintiffs' rights to due process and equal protection. They also asserted claims for equitable estoppel, injunctive relief, and declaratory relief. After the department moved to dismiss (Filing No. 7 in Case No. 8:24CV105) that complaint based on Eleventh Amendment immunity, *see* Fed. R. Civ. P. 12(b)(1); U.S. Const. amend. XI, the plaintiffs voluntarily dismissed the lawsuit without prejudice, *see* Fed. R. Civ. P. 41(a)(1)(A)(i).

The plaintiffs then re-filed against the defendants under "42 U.S.C. § 1981, 42 U.S.C. § 1982, 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. § 2000d, and the Fifth and Fourteenth Amendments to the United States Constitution" in the District Court for Lancaster County, Nebraska. Their current complaint sets forth six claims for relief: (1) "violation of due process,"[2] (2) "violation of equal protection of the law," (3) "intentional discrimination," (4) "equitable estoppel," (5) "injunctive relief," and (6) "declaratory relief." In the plaintiffs' view, the "proposed award of the grants is discriminatory towards non-whites and has had and will continue to have a disparate impact upon non-white[s] and minorities."

---

[2]"The due process clause of the Fifth Amendment applies only to the federal government." *Truong v. Hassan*, 829 F.3d 627, 631 n.4 (8th Cir. 2016). The plaintiffs' due-process claim therefore appears to arise only under the Fourteenth Amendment. *See id.*; *Dusenberry v. United States*, 534 U.S. 161, 167 (2002).

The defendants removed the case to this Court on June 3, 2024. *See* 28 U.S.C. §§ 1331, 1441. They now ask the Court to dismiss the plaintiffs' complaint on a variety of bases, including that they are entitled to sovereign immunity and that the plaintiffs lack standing "as a taxpayer" and otherwise fail to state a claim with respect to a few of their theories for relief. The plaintiffs oppose (Filing No. 8) those grounds for dismissal and argue the defendants should be "judicially estopped from asserting inconsistent positions to those taken" in the earlier proceedings in this Court, including their assertion of additional immunity grounds not raised before.

## II.     DISCUSSION

### A.     Standard of Review

On a Rule 12(b)(1) motion, the Court must "consider whether a party is asserting a 'facial attack' or a 'factual attack' on jurisdiction." *Smith v. UnitedHealth Grp., Inc.*, 106 F.4th 809, 813 (8th Cir. 2024) (quoting *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016)). A facial attack questions whether the "plaintiff has sufficiently alleged a basis of subject matter jurisdiction," while a factual attack challenges "the existence of subject matter jurisdiction . . . in fact, irrespective of the pleadings." *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914-15 (8th Cir. 2015) (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). In analyzing the former, the Court "restricts itself to the face of the pleadings, and [grants] the non-moving party [] the same protections as it would [on] a motion brought under Rule 12(b)(6)." *Carlsen*, 833 F.3d at 908 (quoting *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990)). With respect to the latter, the Court may consider "matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards." *Id.* (quoting *Osborn*, 918 F.2d at 729 n.6).

When considering a motion under Rule 12(b)(6), the Court determines whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Powell v. Minn. Life Ins. Co.*, 60 F.4th 1119, 1121-22 (8th Cir. 2023) (quoting *Usenko v. MEMC LLC*, 926 F.3d 468, 472 (8th Cir. 2019)). As with a

6

facial attack on jurisdiction, the Court "generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint." *Glow in One Mini Golf, LLC v. Walz*, 37 F.4th 1365, 1370 (8th Cir. 2022).

### B. Rule 12(b)(1)
#### 1. Standing

A threshold matter in every federal case is the plaintiff's standing to sue.[3] *See Steger v. Franco, Inc.*, 228 F.4d 889, 892 (8th Cir. 2000) (describing the general burden on the plaintiff to prove standing). Because the jurisdiction of federal courts is confined to "Cases" and "Controversies," *see* U.S. Const. art. III, § 2, cl. 1, they do not operate as "an open forum for citizens 'to press general complaints about the way in which government goes about its business,'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (quoting *Allen v. Wright*, 468 U.S. 737, 760 (1984)). Instead, a plaintiff must generally have a "personal stake" in the matter to be able to sue in federal court. *Id.*

The defendants assert that "personal stake" is absent here with respect to the plaintiffs' claims for injunctive and declaratory relief. In the defendants' view, these claims are asserted by the plaintiffs merely based on their "[s]tatus as a state taxpayer." The plaintiffs disagree and argue that, in any event, Nebraska law permits taxpayer suits "seeking to enjoin an alleged illegal expenditure of public funds." *Rath v. City of Sutton*, 673 N.W.2d 869, 885 (Neb. 2004). Regardless of what Nebraska law permits, the Court's jurisdiction would not extend to such a case. *See Huizenga v. Ind. Sch. Dist. No. 11*, 44 F.4th 806, 810 (8th Cir. 2022) (concluding the plaintiffs could not assert taxpayer standing to make a compelled-speech claim despite their earlier reliance on Minnesota law permitting such claims).

---

[3]Both standing and sovereign immunity are threshold jurisdictional questions. *See Bernbeck v. Gale*, 829 F.3d 643, 646 (8th Cir. 2016); *Lors v. Dean*, 746, F.3d 857, 861 (8th Cir. 2014).

Even a cursory look at the plaintiffs' complaint refutes the defendants' mischaracterization of their claims. To establish standing, a plaintiff must generally demonstrate an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). Those requirements apply with equal force to actions for injunctive and declaratory relief. *See Yeransian v. B. Riley FBR, Inc.*, 984 F.3d 633, 637 (8th Cir. 2021); *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983).

Contrary to the defendants' assertion, the plaintiffs here do not merely assert "a general interest common to all members of the public." *Lance v. Coffman*, 549 U.S. 437, 440 (2007) (quoting *Ex parte Levitt*, 302 U.S. 633, 636 (1937) (per curiam)). They claim they were particularly harmed in losing out on a significant award of public money, an award they allegedly would have received but for the defendants' unlawful and discriminatory means of carrying out the grant program. *See, e.g.*, *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 454 (2017) (considering a First Amendment claim by a church that applied for a public grant and "would have received one, but for the fact that [it] is a church"). Assuming the truth of their allegations, the Court is satisfied that the relief the plaintiffs seek would redress that harm specific to them as applicants. *See All. For Hippocratic Med.*, 602 U.S. at 381 ("If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury."); *Uzuegbunam v. Preczewski*, 592 U.S. 279, 797-801 (2021) (discussing historical redressability jurisprudence and the ability for a request for even a partial remedy, including nominal damages, to satisfy Article III's redressability requirement).

The plaintiffs have Article III standing to seek injunctive and declaratory relief with respect to the defendants' challenged practices. The defendants' Rule 12(b)(1) motion on this point is denied.

### 2. Sovereign Immunity

The defendants further assert they "are entitled to sovereign immunity for claims one and two" of the plaintiffs' complaint, which plead claims for monetary relief for violations of their equal-protection and due-process rights. The plaintiffs not only disagree but argue the defendants should "be judicially estopped" from asserting the state's common-law sovereign immunity because they previously asserted immunity "solely under the Eleventh Amendment."

As an initial matter, judicial estoppel does not apply here. That equitable doctrine "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase," including in a separate suit. *Hughes v. Canadian Nat'l Ry.*, 105 F.4th 1060, 1068 (8th Cir. 2024) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)); *see also Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1047 (8th Cir. 2006). "[T]o trigger the doctrine of judicial estoppel under federal law, there must be a clear inconsistency, and courts consider whether the party being estopped 'succeeded in persuading a court to accept an earlier position,' and 'would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *Buchl v. Cascoyne Materials Handling & Recycling, LLC*, 100 F.4th 950, 963 (8th Cir. 2024) (quoting *New Hampshire*, 532 U.S. at 750-51).

Here, the defendants' mere inclusion of additional arguments for dismissal in this case that had not been raised in earlier proceedings is not clearly inconsistent with their prior position. The Court also never weighed in on the defendants' earlier position since the plaintiffs dismissed the case before it could rule on their motion to dismiss. *See New Hampshire*, 532 U.S. at 750-51 ("Absent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of inconsistent court determinations' and thus poses little threat to judicial integrity." (internal citation omitted)). To the extent the defendants' assertion of common-law sovereign immunity raises a jurisdictional issue, the plaintiffs' argument for estoppel is further unmerited. *See MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288, 298 (2023) (explaining that "not even []

9

egregious conduct by a litigant could permit the application of judicial estoppel as against a jurisdictional rule").

The plaintiffs may be frustrated by their journey back and forth between this Court and state court, defending their suit against different immunity claims. But it is not the kind of obvious duplicitousness and double-dealing the doctrine seeks to prevent. *See Hughes*, 105 F.4th at 1068 ("Courts may apply the doctrine to protect the integrity of judicial proceedings."); *Stallings*, 447 F.3d at 1047 ("A court invokes judicial estoppel when a party abuses the judicial forum or process by making a knowing misrepresentation to the court or perpetrating a fraud on the court.").

Turning to the merits of the defendants' argument, it is well-established that the state's removal of an action to federal court constitutes a waiver of its Eleventh Amendment immunity. *See Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 624 (2002); *Church v. Missouri*, 913 F.3d 736, 742 (8th Cir. 2019). But "the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment." *Alden v. Maine*, 527 U.S 706, 713 (1999). "Developed at common law, 'immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution.'" *Church*, 913 F.3d at 742 (quoting *Alden*, 527 U.S. at 713).

Unlike Eleventh Amendment immunity, the removal of a case to federal court does not generally waive a state's sovereign immunity. *Church*, 913 F.3d at 742-43; *see also Beaulieu v. Vermont*, 807 F.3d 478, 486 (2d Cir. 2015) (explaining that a state may wish to remove a suit to federal court based on a belief that its "sovereign immunity . . . will be better protected by the federal courts" or "to have the federal law claim adjudicated in federal court in the event of a finding that the state's immunity has been waived or abrogated"). Thus—even after removal—sovereign immunity continues to bar a plaintiff's suit against a state "unless 'it is waived or a statutory or recognized common law exception . . . is applicable.'" *Church*, 913 F.3d at 743 (quoting *Metro. St. Louis*

10

*Sewer Dist. v. City of Bellefontaine Neighbors*, 476 S.W.3d 913, 914 (Mo. 2016) (en banc)); *see also Torres v. Tex. Dep't of Pub. Safety*, 597 U.S. 580, 587 (2022) (explaining states may be subject to suit where they consent to suit or where a statute abrogates their immunity).

As the defendants point out, Nebraska's sovereign immunity bars some of the plaintiffs' claims here. *See Davis v. State*, 297 Neb. 955, 982 (Neb. 2017) (stating "a suit against a state agency is a suit against the State" for purposes of sovereign immunity); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (explaining that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity" and that a defendant in an official-capacity action may assert the entity's sovereign immunity). Congress has not abrogated the states' sovereign immunity with respect to actions under § 1983, nor has Nebraska consented to such suits. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989); *Anthony K. v. State*, 855 N.W.2d 802, 812 (Neb. 2014). The plaintiffs' § 1983 claims for monetary relief are therefore dismissed.[4]

In a separate but related argument, the defendants assert "the State [is not] a person who can be sued under § 1983." *See Howlett By and Through Howlett v. Rose*, 496 U.S. 356, 365 (1990) (explaining "the State and arms of the State . . . are not ['persons'] subject to suit under § 1983 in either federal court or state court"). The state itself "cannot be sued under § 1983 for prospective declaratory or injunctive relief," *see Anthony K.*, 855 N.W.2d at 813, but the plaintiffs may be able to seek equitable relief from its officers in their official capacity, *see Alden*, 527 U.S. at 757 (explaining sovereign immunity "does not bar certain actions against state officers for injunctive or

---

[4]Although unclear, the defendants appear to contend that, to the extent the first two claims in the plaintiffs' complaint are based on violations of 42 U.S.C. §§ 1982 and 1985, those claims would similarly be barred by sovereign immunity. The plaintiffs do not respond to those assertions. Either way, those counts seem to squarely allege "deprivation[s] of [] rights, privileges, or immunities secured by the Constitution and laws" and are barred by sovereign immunity in that respect under these circumstances. 42 U.S.C. § 1983.

declaratory relief"); *Heist v. Neb. Dep't of Corr. Servs.*, 979 N.W.2d 772, 782 (Neb. 2022) ("[A] declaratory judgment action against a state officer or agent seeking relief from an invalid act . . . by an officer or agent is not a suit against the State and is therefore not barred by the principles of sovereign immunity."). Therefore, if § 1983 provides the basis for any of the plaintiffs' theories for prospective equitable relief, they may only seek such relief against the department's officers.

Finally, even though the defendants' sovereign-immunity arguments primarily target the plaintiffs' claims for monetary relief, the Court has an "independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010); *see Amerind Risk Mgmt. Corp. v. Malaterre*, 633 F.3d 680, 686 (8th Cir. 2011) (stating sovereign immunity may be "raised *sua sponte* by the court"). The plaintiffs have not successfully pointed to a waiver of the department's sovereign immunity with respect to any claims under state law for declaratory relief. *See Hoiengs v. County of Adams*, 516 N.W.2d 223, 233-34 (Neb. 1994) (explaining an action for declaratory relief against a state agency would be barred by sovereign immunity unless immunity has been waived); *Northwall v. State Dep't of Revenue*, 637 N.W.2d 890, 896 (Neb. 2002) ("[T]he Uniform Declaratory Judgments Act is inoperative as a waiver of sovereign immunity and that a party who seeks declaratory relief against a state must find authorization for such remedy from another source."). Nor have they done so to maintain claims for injunctive relief. The department is therefore dismissed as a defendant with respect to those claims.

### C.    Rule 12(b)(6)

Finally, the defendants argue the Court should dismiss the plaintiffs' "intentional discrimination" and "equitable estoppel" claims for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). The plaintiffs respond that they have sufficiently pleaded a prima facie case of discrimination and that "[i]t would be manifestly unjust to Nash and the North Omaha community to continue to deny Nash" funding under the grant program. Nonetheless, they argue their equitable-estoppel claim should survive the motion-to-

dismiss stage due to its reliance on "a fact intensive inquiry that should not be made on the face of a pleading." The Court finds both claims fall short.

1. **Section 1981**

Somewhat confusingly, the defendants begin their Rule 12(b)(6) argument by discussing whether the plaintiffs can assert a claim under 42 U.S.C. § 1981 based on Nebraska's waiver of sovereign immunity for suits "founded upon or growing out of a contract, express or implied." Neb. Rev. Stat. § 25-21,206. *But see Angel v. Neb. Dep't of Nat. Res.*, 988 N.W.2d 507, 515 (Neb. 2023) ("Sovereign immunity is jurisdictional in nature."). They further refer to the fact that "[a] federal action to enforce rights under § 1981 against a state actor may only be brought pursuant to § 1983." *Artis v. Francis Howell N. Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1181 (8th Cir. 1998) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989)). Regardless, the defendants argue the plaintiffs cannot state a claim under § 1981 because they fail to "identify an impaired 'contractual relationship' under which" they have rights. *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 468-69 (8th Cir. 2009) (quoting *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006)). The plaintiffs again fail to address these arguments in opposing dismissal.

The defendants' assertion that the plaintiffs' potential § 1981 claim is only enforceable under § 1983 holds some weight. But they otherwise overlook the well-established principle that § 1981 is not "limited to existing contractual relationships." *Id.* at 469. As such, the plaintiffs may have a claim as a "would-be contractor" because the statute "applies to discrimination that 'blocks the creation of a contractual relationship' that does not yet exist." *Id.* at 469 (quoting *Domino's Pizza*, 546 U.S. at 476); *see, e.g., Runyon v. McCrary*, 427 U.S. 160, 172 (1976) (concluding § 1981 prohibited the racial exclusion of students from a private school). Without further support for dismissal of this theory of relief, the Court will permit any such claim the plaintiffs make with respect to a § 1981 violation to proceed as part of their § 1983 action for equitable relief.

13

### 2. Title VI

Title VI of the Civil Rights Act of 1964 ("Title VI"), *see* 42 U.S.C. § 2000d, provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." *See also Cannon v. Univ. of Chi.*, 441 U.S. 677, 702 (1979) (explaining that Congress intended for Title VI to authorize "an implied private cause of action for victims of" discrimination). A plaintiff[5] may have a claim under Title VI if they have been subject to intentional discrimination and that discriminatory "reason was the but-for cause of" the plaintiff's disparate treatment. *Abdull v. Lovaas Inst. for Early Intervention Midwest*, 819 F.3d 430, 433 (8th Cir. 2016); *see also Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789, 794 (8th Cir. 2010) (stating because "Title VI prohibits only intentional discrimination," "[p]roof of disparate impact is not sufficient" (citing *Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001)).

Claims of unlawful race discrimination under Title VI are frequently analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 331 U.S. 792, 802-04 (1973). *See Murguia v. Childers*, 81 F.4th 770, 774 (8th Cir. 2023); *Lucke v. Solsvig*, 912 F.3d 1084, 1088 (8th Cir. 2019) (explaining that although *McDonnell Douglas* concerned a Title VII claim, its framework and analysis is applied to "racial discrimination claims in a host of other contexts"). Because direct evidence of racial discrimination is not always available, a plaintiff can establish a prima facie case of discrimination "through evidence giving rise to an inference that [they] ha[ve] been

---

[5]Causes of action for racial discrimination are not limited to individuals. "Where a corporation alleges that it was not awarded a contract on the basis of race, it clearly falls within the zone of interests protected by" federal civil rights statutes. *Inner City Contracting, LLC v. Charter Twp. of Northville*, 87 F.4th 743, 753 (6th Cir. 2023); *see also Bibliotechnical Athenaeum v. Am. Univ. of Beirut*, 2022 WL 710896, at *2 (2d Cir. Mar. 10, 2022) (summary order) (explaining circuit courts have "ruled that a minority-owned corporation may have standing to assert federal discrimination claims, including those brought under Title VI, if it alleges discrimination by a federally funded program").

intentionally discriminated against because of [their] race." *Lucke*, 912 F.3d at 1087; *see also Collins v. Kan. City Mo. Pub. Sch. Dist.*, 92 F.4th 770, 772 (8th Cir. 2024). Evidence that the plaintiff was treated disparately from others "similarly situated in all relevant respects" can satisfy this showing. *Collins*, 92 F.4th at 772 (quoting *Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 938 (8th Cir. 2019)). So can evidence of pretext. *See Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014); *see also Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 272-73 (3d Cir. 2010) (stating *McDonnell Douglas* does not necessarily "require a showing as to 'similarly situated' individuals").

At the motion-to-dismiss stage, the plaintiffs need not "set forth a detailed evidentiary proffer" nor "plead a prima facie case" of discrimination. *Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 796 (8th Cir. 2021) (quoting *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016)); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002) (stating that courts should be careful not to construe the prima facie case as a "pleading requirement" and requiring unnecessary particularity at that stage). The Court only considers whether the plaintiffs' factual allegations "give plausible support to the [] prima facie requirements" of their Title VI claim at this point. *Warmington*, 998 F.3d at 796 (quoting *Wilson v. Ark. Dep't of Human Servs.*, 850 F.3d 368, 372 (8th Cir. 2017)).

Accepting the plaintiffs' well-pleaded factual allegations as true, their complaint falls short of plausibly alleging they were subject to racial discrimination. Apart from the fact that Nash is African-American and North O Rising is minority-owned, the complaint provides little factual context to support the contention the grants are discriminatory. The plaintiffs' allegations only broadly detail certain characteristics of the proposed grant program recipients, including that many were not initially recommended by Olsson, are located outside of the geographic areas of focus, or do not advance economic-development goals. But the plaintiffs fail to describe the racial makeup of those proposed

15

awardees or further explain how the grants "are discriminatory towards non-whites and [will] have . . . a disparate impact upon non-white[s] and minorities."

By merely highlighting those differences between themselves and the proposed recipients, the plaintiffs further fail to illustrate any similarly situated group or project was treated differently from them. *See Lucke*, 912 F.3d at 1087 ("A person is similarly situated to the plaintiff if he or she possesses all the relevant characteristics the plaintiff possesses except for the characteristic about which the plaintiff alleges discrimination."). And while the plaintiffs allege things did not necessarily go as planned with respect to the grant program, they do not provide sufficient allegations of pretext from which the Court can derive an inference of discrimination. *See Edwards v. Hiland Roberts Dairy, Co.*, 860 F.3d 1121, 1125-26 (8th Cir. 2017) (explaining pretext may be shown through a defendant's failure to follow its own policies, disparate treatment of similarly situated individuals, or shifting explanation of its decision). Without further information for comparison and context, the plaintiffs fail to plausibly support their claim the defendants intentionally discriminated against them based on race. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (describing that "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegation" and are not assumed to be true).[6]

### 3. Equitable Estoppel

A plaintiff bears a "heavy burden" when bringing an equitable-estoppel claim against the government. *Bruning v. City of Omaha*, 6 F.4th 821, 827 (8th Cir. 2021)

---

[6]The foregoing analysis may arguably be relevant to other claims alleged by the plaintiffs. *See*, *e.g.*, *Harris v. Hays*, 452 F.3d 714, 717-18 (8th Cir. 2006) (analyzing a § 1981 claim under *McDonnell Douglas*). The defendants, however, have not asserted that the same deficiencies exist in those contexts. Under these circumstances, the Court declines to consider those additional arguments for dismissal itself. *See Bucklew v. Lombardi*, 783 F.3d 1120, 1127 (8th Cir. 2015) (stating "a district court has the power to dismiss a complaint *sua sponte* [under Rule 12(b)(6)], but only where plaintiff cannot possibly prevail and amendment would be futile").

(quoting *Bartlett v. U.S. Dep't of Agric.*, 716 F.3d 464, 475 (8th Cir. 2013)). For equitable estoppel to apply, the plaintiff must first establish six general elements:

> (1) conduct which amounts to a false representation or concealment of material facts or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct will be acted upon by, or influence, the other party or other persons; (3) knowledge, actual or constructive, of the real facts; (4) lack of knowledge and the means of knowledge of the truth as to the facts in question; (5) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (6) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel.

*Estate of McElwee v. Omaha Transit Auth.*, 664 N.W.2d 461, 469 (Neb. 2003) (quoting *Capitol City Tel., Inc. v. Neb. Dep't of Revenue*, 650 N.W.2d 467, 480-81 (Neb. 2002)). In addition, a plaintiff "must prove that the government engaged in affirmative misconduct." *Bruning*, 6 F.4th at 827. Even then, Nebraska law provides that equitable estoppel will not be invoked "except under compelling circumstances where right and justice so demand" and only to "prevent[] manifest injustice." *Estate of McElwee*, 664 N.W.2d at 468.

The plaintiffs here have failed to plead any false representation or concealment of material facts by the defendants amounting to affirmative misconduct under these circumstances. As pleaded, their estoppel claim largely hinges on the fact that Olsson recommended the North 24th Street project for an ERA grant during the scrapped first application process. While the plaintiffs allege every other applicant recommended by Olsson was ultimately chosen for a grant, they do not say whether Olsson or the defendants made any assurances the recommendation would result in a receipt of funding.

17

The plaintiffs' argument for equitable estoppel based on their satisfaction of the "deadlines, timelines, and necessary criteria to obtain the grants" is also unavailing. They do not—and apparently cannot—allege that the legislature, defendants, or anyone else represented that any applicant that satisfies the general criteria set forth for the grant program would receive a grant. Without such express assurances from the defendants, there is no "manifest injustice" to prevent here.

Based on the foregoing analysis and conclusions,

IT IS ORDERED:

1. Defendants Nebraska Department of Economic Development, K.C. Belitz, Ryan ZimmerMas, Lydia Lassen, Deisy Coyle, Abra Kataka, and Assentina Kataka's Motion to Dismiss (Filing No. 2) pursuant to Rule 12(b)(1) is granted as to sovereign immunity and denied as to standing.

2. The defendants' Motion to Dismiss pursuant to Rule 12(b)(6) is granted in part and denied in part.

3. Plaintiffs Jonathan Nash and North O Rising, LLC's claims for monetary relief for alleged due-process and equal-protection violations are dismissed without prejudice for lack of subject-matter jurisdiction.

4. The plaintiffs' claims for "intentional discrimination" and "equitable estoppel" are also dismissed without prejudice for failure to state a claim.

5. Defendant Nebraska Department of Economic Development is dismissed from the remaining claims for injunctive and declaratory relief.

Dated this 19th day of August 2024.

BY THE COURT:

Robert F. Rossiter, Jr.
Chief United States District Judge